Mr. Sansone. Good morning, your honor. Good morning, your honors, and may it please the court that I consider this the most important case I've ever argued in the 35 years of my practice. Have you reserved any time for the lawyer? I beg the court's pardon, three minutes. All right. Start it with 15 here. Thank you, your honor. Make it 12. Start it with 12. Thank you. I represent a gentleman. I appreciate that, but let me start with this. Doesn't it strike you as, it should start with 12 minutes, he's reserved three. No, no, he's, thank you. Doesn't it strike you as an irony, and to some maybe even a cruel irony, that the only remaining defendant in this appeal may well be the very least culpable in this whole series of very unfortunate events and non-events? I would respond by saying that there are a lot of people that are culpable in this matter, but I do not excuse the officer. All right, then let's get into that, because for the life of me, I do not see how the existence of probable cause here is not a slam dunk. Oh, whatever. With due respect, there's been no adjudication of probable cause here. Oh, that's funny. I think there was a preliminary hearing where a magistrate, a state official would have made that determination, right? The issuance of the warrant, right? It was waived. There was no finding of any kind. It was waived by a... The issuance presumes that there was probable cause. No warrant's going to be signed by a district justice in Pennsylvania. Probable cause... And in fact, when it got to common pleas later, there is on the record a declaration that there was probable cause existing. So both the judge of the court of common pleas and the district justice and the Pennsylvania minor judiciary would have made that determination. Well, according to the United States Supreme Court, a finding of probable cause like the finding here does not satisfy the Fourth Amendment. There was no finding by the preliminary hearing court because it was waived. There was no finding by Judge Leskinen of the common pleas court because he had the opportunity to have a hearing on this, and when the government came to that hearing, they said, we have no evidence. We cannot make our... Was there an arrest warrant issued? There was an arrest warrant based upon an affidavit of probable cause. Right. So I... Maybe it's a very unusual assumption to make, but one I thought would assume that probable cause had been determined by a member of the minor judiciary before he issued an arrest warrant. Well, there was a determination that based upon the affidavit, there was probable cause. What does that affidavit say? So there was probable cause determined by a district justice. Well, if you call a determination in this case relying on the bare allegations in the affidavit, then I would agree with you. But the problem is... That's how they're made all the way, all the time, Mr. Sansone. That's the way it happens in the state criminal courts. Well, just as his court said in Wilson, every time a police officer puts down something in an affidavit of probable cause, it doesn't mean that that creates probable cause. That goes without saying. But in Wilson and Dempsey, in stating a malicious prosecution claim, you would need to show that there had been a knowing or at least reckless misrepresentation or omission that was material. Here, from what everyone seems to agree, is the record and sequence of events. Cox included in the affidavit for probable cause the information that was then available to him. I understand you argue that more investigation should have been done. More investigation was done. But as of the time the affidavit was filed and the arrest warrant procured, he did not... I mean, you haven't alleged that there's any omission or misrepresentation in the affidavit. I absolutely have. What is that? There are several omissions. The first one is... The question was in the disjunctive. I think she asked about misrepresentations or omissions. Has there been any misrepresentation? Yes. Why? The claim in the affidavit that supports the probable cause from the police officer, he claims that he did not see the hospital records that show that the alleged victim here said he fell off the steps. But there was evidence in the record to show that he, in fact, saw those hospital records. What is that? Well, let's start with the hospital records were procured on the day of the investigation. Why? Well, there was only one police officer assigned to the case, the defendant. So, a fair assumption is that it is he who sought these hospital records. There were actually two police, two union tenant police officers involved at that time. The patrolmen had turned the case over. No. It was 16 days later. Please don't interrupt me. There had actually been two officers involved. In fact, the patrol officer is the detective. He doesn't investigate. He turned it over to Cox. Well, to be accurate, he stopped his investigation that day, and several weeks later, Mr. Cox was assigned to investigate this. That's what detectives do. Right. The first patrolman said in his report, page one of the investigative report, that no one at the scene could say what happened here except that the person fell. So, first, defendant Cox knew or should have known from reading the report that he, on the first page of that report, is the patrolman's part of it. Yes or no, the then-defendant, Mr. Ginesse, responded to questioning from Detective Cox to the effect that he had indeed pushed Mr. Fiffy. Ms. Tummins testified that Mr. Fiffy Please, please, Mr. Sensen, she doesn't come into the picture until years later. The facts of the case are that he told Ms. Tummins, Will you please answer my question, is that not correct? She does not come into the case until quite some time later. That is correct. Does the affidavit of probable cause contain an averment that Mr. Ginesse told Detective Cox in response to questioning that he had pushed Mr. Fiffy? That's what the affidavit says. The record, however, says that Mr. Ginesse says that he responded to Detective Cox who told him he did this. He did not volunteer for questioning. When did he say that? What's that? When did he say that? When did, who said that? Mr. Ginesse? He said that to Ms. Tummins when she asked him when she Quite some time later. Right, yeah, Judge, but there was no one present when Mr. Cox took this supposed confession. Yes, so there has to be someone present for there to be probable cause existing. Well, I would say this. When a police officer enters a mental institution where a person has been involuntarily committed on a 302, they have to have some suspicion that that person might not be able to voluntarily waive their rights or make a confession. And when the district attorney in this case met with my client without any permission from anybody else That's the district attorney, that's not Detective Cox. I'm talking about Detective Cox right now. He's the only party here who remained as a defendant. Well, that's true, Judge. But we have evidence that Mr. Ginesse was, it was easy to tell from his demeanor that he could not waive his rights. Can you imagine if a police officer presented with a specific admission that he had indeed committed a crime, chose to ignore that admission and not proceed with an arrest, what the reaction would be? The problem here is that he didn't know the rest of the evidence that he had in his possession that this man fell and was not pushed. And what is the evidence that this man fell? The admission of the alleged victim in the hospital when he said, I fell, and I fell because I shouldn't be around steps, I'm not good on my feet. That admission was made in a statement that was in the possession of Mr. Cox at the time he wrote the affidavit of probable cause, and we know that because if you read the affidavit, he refers to that hospital record when he says that Mr. Ginesse was treated by Dr. Laura Pemberton. There is one document in the record that shows that she was the treating physician on that day. That is the document in which the admission is made by the alleged victim that he fell and that he was unsteady on his feet. There is clear evidence that Mr. Cox had that in his possession because he refers to Dr. Pemberton in his affidavit of probable cause. He further refers to Dr. Obel, the second treating physician, which was also part of the medical records. The medical records show that they were printed on the only day there was an investigation in this case. Mr. Cox admitted that he turns all of his stuff over to the district attorney. We got that, Mr. Tummins got that stuff from the district attorney, and there is no evidence that there was a district attorney in place the day that Mr. Cox investigated this. So there is evidence that he had these records in his possession at the time that he wrote this affidavit because he refers to things that are in those records. So he should have known that the guy said he fell. Furthermore, the patrolman said, everybody at the scene said the guy fell. He could have asked his patrolman, why did you say that? Who is everybody at the scene? That's what the patrolman said. That's a good question, and that's something he should have asked. Who is everybody at the scene? According to the rest of the records that he had in his possession, the wife was on scene and said, my husband fell down the steps. And that information was available, turned over by Mr. Cox, to the district attorney. What about the information Mr. McVeigh conveyed to Cox? Mr. McVeigh had a motive to distort the truth. And even if he didn't identify, those are credibility issues that are sorted out later at the time of trial. They are not usually in play for purposes of probable cause determinations. Well, I understand that, but he had the evidence from the wife that my client fell. He had the evidence from the victim that my client fell. He had the evidence from EMT that my client fell, and the evidence from the patrolman that he fell. Counsel, with time limited, I'd like to understand better your argument on the motion to amend, because I take the heart of the claim you raise is a process claim. As you mentioned at the outset, there are many different players here, and things along many years could have gone differently. There came a point where, and unfortunately it was only 11 days before dispositive motions, when your client sought to amend, to add the Commonwealth of Pennsylvania, presumably to address the issue of the orders that were repeatedly handed down, resulting in years of incarceration, years of civil commitment, before returning to court on addressing criminal charges. Why wasn't there undue delay, as the district court found? Is there an opportunity here for you to proceed on remand to amend and add the Commonwealth as a defendant? I think the case, although we cited it, indicates that near delay is not enough reason not to permit an amendment. And secondly, we were within the statute of limitations. We could have taken a second claim and filed it, and there would have been no objection, because it would have been a brand-new claim for judicial. You're right, near delay is not. I'm sorry? Near delay is not, but we look at the justification for the delay, and we look at prejudice. Can you address those two items? The delay is on me. To be honest with you, it didn't occur to me that there was a cause of action that could occur from this, until we had a brilliant woman, Elizabeth Tuttle, working for me, that brought this case to me and said, why are we making this Title II claim? I've never done it before. I think this is a complicated case to begin with. And when she brought this to my attention, I said, no, we don't have any choice but to make this claim, because it clearly, the case anticipates, the time of the delay anticipates, that people who are in this situation, mentally ill people, may have this occur to them. Therefore, they have what is under the ADA. So I didn't know enough about the cause of action to make the claim, until I had a brilliant young woman bring me the information. Well, the district court hasn't addressed prejudice, but perhaps you can address why there isn't prejudice on the face of this case to Mr. Cox, in adding a defendant and a claim, or claims against that defendant, just before dispositive motion. First of all, I have to go to Judge Smith's point. There's a lot of blame to go around. It seems to me that there's no prejudice to Mr. Cox to have someone else take some of the blame. But if we talk about prejudice, my client spent 10 years in incarceration without trial. The balance of the prejudice has to align with his rights. And if inadequate counsel like myself can't imagine every cause of action from the very moment that he takes a case like this, that shouldn't be against my client. He should have the right to pursue that remedy, even if I wasn't as quick on the drop as I needed to be. In this case, this issue hasn't been litigated. It's not something that happens to every civil rights lawyer. And I've been doing this for 35 years. I've never seen anything like this. I just didn't know. It's that simple. The other ground that can keep it from going forward, besides the undue delay in prejudice, and we'll ask your colleague on the other side of the aisle about that as well, is futility. I'm not going to move that one. Futility. There wouldn't be a reason to remand if the claim was, in fact, futile. Why would it be futile, though? Well, perhaps you can address that as well, because why aren't you asking the federal courts to review the decisions of the state court? Something that would raise a Rooker-Feldman question. A Rooker-Feldman question? Because this was not a decision that was disrespected by the state court. Judge Leskin had said there was obviously probable cause, but that was never adjudicated in any court. And, in fact, the district attorney came forward to admit that they didn't have sufficient evidence to go forward with the case. So his finding of probable cause was dicta. But it's not probable cause that would really be the issue on a process claim. This goes to your ADA claim and to your due process claim, which I understood from your briefing to relate to the series of orders with the consequence that your client remained incarcerated with a habeas petition that was pending and not adjudicated for nearly a decade. I'm not understanding. What's your question, Judge? I'm sorry. The question, the Rooker-Feldman issue is not as to the order of probable cause. It's as to the orders along the way of adjudicating him not competent and ordering that competency examinations go forward and the habeas hearings be postponed. That did not constitute a judgment as Rooker-Feldman anticipates it. That was an interlocutory finding, not appealable necessarily unless it was certified for appeal. And so he was not a loser in the state court coming in to try to undo a state court loss. That's not a loss, a judgment, as Rooker-Feldman anticipates it. And you're basing that on Great Western, the distinction between reviewing the merits and reviewing the consequences that give rise to a separate constitutional right. Exactly. That's precisely correct. I would like to address several other points, but I'll save the amount of time. You may do that on rebuttal. Thank you, Your Honor. Ms. Mattawood. Good morning, Your Honors. Carol Vandewood for the appellee. Detective Cox, now retired Chief Cox. I wanted to address one of the first questions posed by Judge Smith at the outset of the plaintiff's argument, and that was the issue with respect to probable cause. In addition to certainly the criminal judges in the Fayette County funding, that probable cause existed to hold Mr. Janessa over for trial, we also have the no-pros order issued on 12-10-2015 at 8.191-193 in the record, where that judge, after looking at the motions to, the habeas motions, the motions to dismiss filed by both Ms. Tommins and the public defender, issued in its order that there was, I quote, clearly sufficient probable cause to file the criminal complaint and pursue the matter. This is after the judge reviewed all of the materials with respect to competency, waiver, and everything else. On that issue, probable cause is one thing. We're looking at the order as the basis for it. And that's contrary to our law and contrary to Pennsylvania law in the sense that we don't look only to the order. We look to the fuller context, including the motion that was filed. The motion here indicated it was for insufficient evidence, and under Pennsylvania Supreme Court's precedent, a motion to no-pros charges for insufficient evidence is, in fact, a disposition in favor of the accused. How can that, how can you... There is additional evidence of the state court findings along the lines of what Judge Smith was saying, that there was probable cause. Not only the judges that had addressed the criminal charges following the arrest at the preliminary hearing, but also that this judge, after reviewing everything, including the motions challenging competency and waiver, also found sufficient probable cause. I'm not saying that this is a standard for this court. I'm just pointing out that also in this record there was another finding. You're taking that off the table. There's independently probable cause in the initial issuance of the arrest warrant. Correct. Correct. Yeah, because there is a determination by a prosecutor that there is not sufficient evidence to take a matter to trial at a date after, perhaps well after, the initial arrest. Doesn't mean there was not PC at the time of the arrest. Correct. And again, in this case, it wasn't necessarily a lack of evidence. It was an issue with respect to competency and whether or not Mr. Gennes would ever be able to stand for trial on those charges. And he was also deemed not to be a danger, and he was being effectively supervised outside of the criminal justice system as set forth in the Nolpross order. Could a Nolpross be a basis for a favorable determination? It can be in certain circumstances, but that circumstance does not exist here. And specifically, it has to illustrate or indicate the actual innocence of the accused. That's not an issue in this case. The restatement says that it can be a favorable determination, and the Supreme Court of Pennsylvania has adopted that section. Again, it can be, yes, under certain circumstances. Those circumstances don't exist here because we don't meet the actual innocence threshold. The fact of the matter is, in the Pennsylvania system, a district attorney can go in under all kinds of circumstances, including perhaps a policy determination that we've got a backlog, we have too many cases, it just isn't important enough for us to go forward. Certainly, absolutely. There's nothing that requires a district attorney to take a case to trial, even if there is sufficient probable cause. There could be worries about suppression of evidence that might compromise your case. But regardless of what the issues are, there's no requirement that a case proceed to trial once there's been an initial finding of probable cause to proceed to trial in the matter. Your brief doesn't address the merits of the district court's Rooker-Feldman holding. I wondered if you could tell us about how our ruling in Great Mining would affect the Rooker-Feldman analysis of the district court. I have not read the Great Mining case in depth. I will say I've reviewed the Rooker-Feldman issue in our motions and with respect to the district court's opinion and would agree that in this context that doctrine would apply because the issue here is that plaintiffs challenged the process of the state courts and the continued finding of a lack of competence, which resulted in Mr. Ginesse being held for approximately five years without trial. That process would require this court, the district court, to essentially sit as an appellate court with respect to the habeas proceedings that were then pending. We had the interface during the long process involving Mr. Ginesse of Pennsylvania mental health law and the Pennsylvania criminal code, right? I mean, Mr. Ginesse was 302 initially, right? Yes. So what does the record show was the participation of mental health authorities at the Fayette County level during the course of this prosecution? I mean, that's very limited, quite frankly, on this record. No discovery was taken by plaintiffs in this matter to build a record on the issue of Mr. Ginesse's competency. No depositions were taken. None of the witnesses that were identified as purportedly challenged the probable cause finding were deposed. None of the doctors who treated Mr. Fithick were called or deposed. I do understand that a state hospital, Mayview, did find him early in the process, I think approximately 2011 or so, to be incompetent to stand trial. Mayview is the Pennsylvania state facility where evaluations of criminal defendants with serious mental health problems are evaluated and often eventually incarcerated. I have to say that in a lot of years in Pennsylvania, from the practice of law to being a district attorney to being a common police court judge to my years in the federal court, I've never seen a concatenation of events like this and a situation where a criminal defendant with obvious mental deficiencies and illness that clearly implicates the Mental Health Act was run back and forth and warehoused and left in such a condition of limbo from time to time and at times, obviously, without adequate criminal defense representation. Absolutely, and that is particularly troubling to me as I got involved in this case as well. Mr. Janess was assigned a public defender who fairly promptly filed a habeas motion challenging... But then not much happened. Exactly, nothing happened. And then Ms. Cummins got involved in 2012. But even she didn't act with dispatch. Correct, again, nothing else happened. Just people sitting on his rights, sitting on his rights. We now get to this civil litigation. And no judge of the court of common police seemed to have taken hold of this. I think the matter was before several common police court judges during the long history. It is a very unfortunate chain of events. The ball was fumbled and fumbled and fumbled. But we go back to Mr. Cox, or Detective Cox, and the issue with respect to him is whether or not with what he understood of the circumstances at the time of the arrest there was sufficient facts to proceed with the finding of probable cause, and there was. Everything that happened subsequent to that, we're talking with the public defenders, Fayette County, the courts of common police. All of that, again, was outside the scope of Mr. Cox's involvement in this case. Is there prejudice to Mr. Cox, or Detective Cox, if there is an amendment permitted? Well, I think the amendment is absolutely impermissible, but to the extent that I think there is prejudice, yes. What's the prejudice? The prejudice would be that a case would proceed to trial that should be over and that this would continue to be. Well, that's presuming a lot, right? I mean, the question is whether it would be amended. That was a prejudice argument, yes, made in our opposition to the motion to amend, is that the case not only that it lacked merit, but that it would be adding a new party to a claim that lacked merit and involve additional briefing and possibly another defendant proceeding to trial. What additional discovery or even really additional claim is involved when what we're presented with seems like a substitution of defendants? The county was initially charged that we're going to bring these very same charges because of a misunderstanding on counsel's part about the proper defendant. That party was dismissed, and then they sought leave to add the commonwealth. How is there prejudice to Cox in the discovery, in the nature of the claims, in the underlying facts that could rise to those claims? The argument presented was that it added a new defendant, but not only that, But that would mean that every amendment was to have prejudice, right? Yes, I'm just saying we did oppose the motion, not only on that ground, but also on the fact that the basis for the motion, which was a newly discovered Supreme Court decision, was not in fact newly discovered. So we also challenged It was apparently newly discovered by the person advancing the authority at that time. There just wasn't anything new about the authority. And that, again, is also just putting aside the Rooker-Feldman problem with respect to that issue, which was, I think, where the district court went with that. Well, you're sure that great mining would stand for the proposition that the district court's Rooker-Feldman analysis was correct? I would advocate that the Rooker-Feldman doctrine would preclude the district court from reviewing the competency rulings and the process that held Mr. Geness in place. I mean, basically what that claim would ask the district court to do is to address the habeas arguments that were made in the state court. No, that's the point that there was no ruling. There was a habeas petition here pending back to 2007. Yes. There was no ruling on that. Chief Cox had no role in that habeas petition. That's lost, apparently, in the Court of Common Pleas system of Platt County. So the orders at issue are the orders for his examination for competency, that he was not yet confident in ordering that those... So the continued orders finding him not confident in moving the case to trial or ending it. And so, in other words, they're saying the way that they handled it wasn't appropriate. But that is a different issue than reviewing the merits of those claims. They're not disputing that it was a proper determination of incompetency or under Pennsylvania law that referring for examination was an appropriate thing to do. But I didn't really... Their point is a process one, as I understand it, under the ADA, and as a matter of federal constitutional due process, that the consequence of these series of orders being entered, the actions that were taken by judges of the Commonwealth, violated those rights. Why isn't that exactly the kind of separate, freestanding, non-merits-based review that courts, including in Desipetsa and Parkview, we've said may precede and does not even implicate Booker Feldman? I do believe, though, that they're inextricably intertwined, and that's where the district court went. You don't use that test, right? We don't use that test anymore. Fair point. Again, I would just say when you look at the Booker Feldman doctrine, what you have to do is you have to look at whether or not the district courts have jurisdictions over cases brought by a state court loser complaining of injuries caused by what the state court did. And I think here that's essentially exactly what the plaintiff is doing. Mr. Boyle's federal claim is if the plaintiff is inviting district court to review and reject the state court judgment. Now, he's made the argument there's not a judgment, but even if we look at what orders, what decisions are being reviewed, they're not saying to raise a due process claim or ADA claim that you need to review the merits of those. They're saying that the actions taken by those state actors themselves gave rise to the ADA and federal constitutional claim. And I understand your points, Your Honor. And if you'd like, I'd be happy to submit a supplemental brief on this issue. I mean, it doesn't go directly to Chief Cox, but I'd be happy to address those particular questions since we didn't flesh it out in the brief, if you would like. I'm happy to do that. But with respect to the amendment of the complaint, the untimely request to amend the complaint to add a new party to alleged claims, the exact same claims that had been alleged initially against Fayette County, so the argument that I didn't know we could assert this because I'm not experienced enough to know that, I mean, that's contradicted by the fact that those allegations were alleged in the original complaint against Fayette County, which was subsequently dismissed. Would there be any prejudice to your client going forward? I mean, depending on our rulings here, isn't it conceivable your client is even no longer in the case? If our client is out of the case and we have no other witness, then no. I think we would be. That's the only prejudice your asserting would occur if he continued his defense. Thank you very much. We'll have Mr. Stinson back on rebuttal. Oh, I'm sorry. Can I ask one question? That is something Chief Judge Smith alluded to earlier. In terms of the involvement of the mental health system, under Pennsylvania Statute Section 7304, Court-ordered involuntary treatment, it appears under Pennsylvania law that the involuntary treatment, that is the civil commitment when he's ordered, it goes for approximately five years, that that under the statute is not to exceed 90 days. But in certain circumstances, including where severe mental disability is based on acts that give rise to charges of murder or involuntary manslaughter, among others, that then it can be extended up to one year. Do you have any information as to what processes took place within the mental health institution? I do not. At the one-year point and how it is, given the plain language of the Pennsylvania statute? I do not. The civil commitment was extended up to five years? And I don't think there was no record really developed on that case. No depositions were taken by plaintiff with respect to any participant of Mr. Jenez's health care. That is not on the record in this case. I don't think a single deposition was taken by the plaintiffs in this case. Those records were not detailed in the record that we had at the summary judgment stage. And again, I think this just goes back to the very beginning, that this is an unfortunate circumstance where the public defenders, perhaps representing him, didn't push on the habeas petition. Ms. Tummins got involved and was apparently hired to represent him for everything going forward. Well, it's not only just that the public defender didn't push on it. The public defender should have. The court system should have been managing its own docket more efficiently and vigilantly than was it going. Certainly it looks like this was not handled in the best manner possible. But again, the record was not developed on the issue. It's putting it mildly when someone was incarcerated, civilly committed, without any process that is assured by, it appears, even the Pennsylvania Code over a period of nearly a decade. If Fayette County was still on the case, I'm sure their counsel would be the party to ask what happened during the post-arrest treatment of Mr. Janess. I mean, Mr. Cox was involved, or Detective Cox was involved up until the point of the arrest. He didn't have anything to do with that. He wasn't involved in the treatment and care. And that was really not an issue in the summary judgment process. So that record, as it pertains to our client, is not something that we spent a significant amount of time on. Plaintiff didn't build a record on that. We understand. Thank you. So I apologize. Thank you. Thank you. Ms. Hanson. Your Honor, I'd like to speak to two points. The first one is the issue of Moses' prosecution and the non-prose. Judge Smith has posited that a prosecutor could mal-prose the case for a lot of reasons. The record in this case is clear why he mal-prose the case. He came to a habeas hearing for the purpose of presenting evidence to secure the conviction, at least to hold the defendant. He got no evidence. He said, I have no evidence. He said, in the interest of justice, we ask you to dismiss this case, not for judicial economy, but in the interest of justice, because we cannot meet our evidentiary purpose. That can mean all kinds of things. He exercised his prosecutorial discretion, and the court granted him no prosecution. He said why he exercised it. He said, because we don't have the evidence to meet our purpose. Right, right. I buy that. I mean, it still, it may even mean that. It doesn't mean that there wasn't probable cause at the time of the arrest. The issue of whether or not malicious prosecution goes forward is whether the non-prose, the notion that he was innocent. Interestingly to me here, the non-prose was granted without prejudice. I don't ever recall, and it's been many, many years ago, a non-prose being granted without prejudice. He addressed the non-prose without prejudice. He says there's probable cause, but there's been no adjudication of that. Well, it can't be correct that if he said that, he had some familiarity with the record and certain papers in the case to have made that determination. There was no reason for a trial judge to gratuitously make the comment that there is probable cause if he doesn't know that there was probable cause or believe that there was probable cause. It wasn't necessary for the non-prose. Well, that's why it was dicta. There was no adjudication of this issue at all. What common police court judges say isn't dicta. I'm sorry, I couldn't hear you, Judge. What common police court judges say is not dicta. He wasn't there to adjudicate probable cause. That wasn't his function. His function in that hearing, we know that. We're talking past each other. I believe that's what dicta is. Let's assume for a second, in some fantasy world that I can't imagine at the moment, but let's assume for a second that it is dicta. Well, apparently try Fayette County. Right. Let's assume for a moment that it is dicta. It does say dismissal without prejudice, and that means something. Right. I mean, how can that be consistent with the notion of actual innocence? Well, it's funny because the government didn't ask for, forget about that, forget about the government. You know, his declaration that it's without prejudice flies in the face of what the prosecutor said, which is we don't have a case. And it's 10 years later. When is a case going to show up? The second point I'd like to address, if I may, is the issue that Judge Smith raised about Ms. Tummins sitting on the case. Ms. Tummins made repeated requests for a habeas corpus appearing. She made over 20 requests to the district attorney for the discovery in this case, all acting as pro bono counsel. She repeatedly attempted to get this done, and when she finally couldn't get it done, she stood in the courtroom and stamped her foot until they gave it to her. She let years go by without filing a motion to compel, and as a result the statute of limitations has run on the vast majority of the claims. I have to argue that point. That is a real problem, isn't it? I want to address that issue directly. Remember that she came into the case, tried to get a guy who she didn't know, didn't know his actual condition. She tried to get him a trial. She was trying to get him his rights. She didn't know that the record contained all kind of information about how his constitutional rights had been violated. All of us as lawyers know the importance of statutes of limitations. Judge, when she came into the case, she did not know. We've heard you on that point, Mr. Sansone. I think enough has been said. Well, I really would like to finish this analysis if I may, Judge. You have 60 seconds. When she came into the case, she thought this was a guy who just wasn't getting his trial rights. When she talked to him, he said, I didn't do it, which is what everybody says. He blamed the police, which is what everybody says. She didn't learn that, first of all, there was excavatory evidence right from the file that she had been demanding for years. She did not know that at the time that she engaged the case. What she did was repeatedly ask the court for a habeas corpus hearing so that the government could present some evidence of guilt. And they never gave her that. And when they had the opportunity, they walked away from it. She didn't know that he was highly susceptible to suggestion until the last bit of discovery that she got. That put the final piece in place. As Judge Krause has suggested, she didn't do her job. We will take the matter under advisement. However this is resolved, it is a tragic case in numerous ways.